## AFFIDAVIT OF TASK FORCE OFFICER JUAN D. INFANTE IN SUPPORT OF A COMPLAINT AND WARRANT FOR THE ARREST OF:

JUAN DIMEL GIL CASTILLO

I, Task Force Officer ("TFO") Juan D. Infante Jr., being first duly sworn, depose and state as follows:

INTRODUCTION

1. I am a State Trooper with the New Hampshire State Police and I have been a full time certified police officer in the State of New Hampshire for approximately twelve years. I attended and graduated from the 139th New Hampshire Police Academy where I obtained my certification as a full time police officer. From 2005 to 2010, I was employed as a police officer with the Town of North Hampton, New Hampshire Police Department. I was assigned to the Patrol Division of the North Hampton Police Department. Some of my duties while assigned to the Patrol Division included basic patrol duties, investigations ranging from minor violations to misdemeanors and felonies, report writing, interviewing witnesses and suspects, and evidence collection and processing. I also completed search and arrest warrants that involved violations of the Controlled Drug Act.

2. I joined the New Hampshire State Police in 2010. I am currently assigned to the New Hampshire State Police Narcotic Investigation Unit. While assigned to the Narcotic Investigation Unit, my primary duties are to investigate violations of the New Hampshire Controlled Drug Act, NH RSA 318:B-2. Many of the investigations that I have been involved with relate to offenses involving the possession, sale, and possession with intent to sell various controlled drugs. During the summers of 2012 and 2013, I was

assigned to a street crimes unit within the City of Manchester where I worked in conjunction with Manchester police officers in a plain clothes capacity to combat prostitution, gang, drug, and street crimes throughout the city.

3. In October of 2015, I was assigned as a Task Force Officer to the United States Drug Enforcement Administration ("DEA") Strike Force-Manchester District Office. While assigned to the DEA Strike Force, my primary duties are to investigate the distribution of controlled substances in violation of state and federal drug laws, including Title 21, United States Code, Sections 841 and 846.

4. I have received significant training in the field of narcotics enforcement and investigations. Through my training, education, and experience, I have become familiar with the manner in which drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations, meetings, and Title III intercepts.

5. I am submitting this affidavit in support of a criminal complaint, and accompanying arrest warrant, for Juan Dimel Gil Castillo ("GIL CASTILLO") for conspiracy to distribute and to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846.

6. Since this affidavit is being submitted for the limited purpose of obtaining

a criminal complaint, I have not included each and every fact known to me concerning this investigation. However, I have set forth all relevant material information I am aware of and the facts that I believe are necessary to establish probable cause to believe that GIL CASTILLO has conspired with others to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846.

## STATUTORY AUTHORITY

7.     This investigation concerns an alleged violation of 21 U.S.C. §§ 841(a)(1) and 846 relating to a conspiracy to distribute and possess with intent to distribute, in the District of New Hampshire, controlled substances including heroin and/or fentanyl. Title 21, United States Code, Section 841(a)(1) makes it a crime for any person "knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Heroin and fentanyl are controlled substances pursuant to 21 U.S.C. § 812.

## PROBABLE CAUSE

8.     The information in this affidavit is based upon my personal knowledge and experience as well as information provided to me by other members of law enforcement and witnesses.

9.     This investigation is based in part on information provided by a confidential informant ("CI"). Before his/her recent arrest, the CI was a drug distributor in New Hampshire. The CI has previous convictions for simple assault (2009) and a misdemeanor drug offense (2016). In August and September 2017, law enforcement officers used another cooperating individual to conduct two controlled purchases of

approximately 25 grams of heroin/fentanyl from the CI.[1] Officers then received a search warrant for the CI's residence where they recovered various controlled substances including crack cocaine and over 200 grams of suspected heroin/fentanyl. They also recovered a firearm and drug packaging paraphernalia. The CI agreed to cooperate with law enforcement officers and admitted to using and distributing drugs.

10. The CI stated that he/she travels to Lawrence, Massachusetts once a week to buy heroin/fentanyl from a source of supply to distribute in New Hampshire. The CI stated that he/she has been buying heroin/fentanyl from the same source of supply in Lawrence, Massachusetts for approximately five months. Every time the CI wants to purchase heroin/fentanyl, he/she calls a telephone number and places an order with a "dispatcher" who answers the telephone. The dispatcher then gives the CI an address in Lawrence. The CI then travels to the address and meets various different drug "runners" to make the purchase, usually on the street. During the CI's initial debrief he/she first stated that he/she buys 100-200 grams per week but later admitted to buying 500-600 grams per week which he/she then sells to 10-20 customers in New Hampshire. The CI stated that he/she last traveled to Lawrence last week and purchased 515 grams of heroin/fentanyl for $15,000 and that the drugs in the house was what was left over from that purchase.

11. On September 8, 2017, the CI agreed to conduct a controlled purchase of

---

[1] The New Hampshire State Police laboratory confirmed that the drugs sold on one occasion contained 27 grams of a mixture and substance containing fentanyl. Lab results for drugs sold during the other controlled buy and the drugs found pursuant to the search warrant of CI's residence have not yet been received. Although CI referred to the drugs as heroin, I know based on my training and experience that heroin and fentanyl are commonly substituted for each other or mixed and that drug users and distributors may not know the exact contents of the controlled substance they are using or selling. It is often impossible to determine the nature of the substance visually as heroin and fentanyl often appear identical. Where lab results have not yet been received, "heroin/fentanyl" will be used to describe the controlled substances at issue in this case.

heroin/fentanyl from his/her source of supply. While in Salem, New Hampshire, in the presence of law enforcement officers, the CI placed a recorded telephone call to his/her source of supply. An unidentified female answered the phone and the CI ordered "550" meaning 550 grams of heroin/fentanyl. The female confirmed and told the CI to send a text when he/she was close. The CI recognized the female's voice and stated that he/she had spoken to the same female to coordinate previous drug purchases. The CI then drove towards Lawrence, Massachusetts and placed another recorded call in the presence of law enforcement officers. This time, a male answered the phone and told the CI that he would text him/her an address. Shortly thereafter, the CI received a text message directing him/her to a specific address.

12.     The CI was searched for drugs, unexplained currency, or other contraband and entered a Massachusetts State Police undercover vehicle driven by a Massachusetts State Police Trooper acting in an undercover capacity ("UC"). The CI and UC then drove to the location specified in the text message. Other police officers conducted surveillance. Shortly after the UC parked the vehicle in the specified location, an individual later identified as GIL CASTILLO exited a nearby vehicle and began to walk up to the UC's car. Before reaching the car, he turned and walked away. The CS then received a text message directing him/her to travel to a different location. Based on my training and experience, I believe that this may indicate that GIL CASTILLO and his co-conspirators were engaging in counter surveillance techniques. I know that drug traffickers frequently change the location of drug sales in order to impede law enforcement officers from conducting surveillance.

13.     The UC drove to the new location and parked. Shortly thereafter, GIL

CASTILLO was observed by surveillance officers approaching the UC's vehicle. GIL CASTILLO walked up to the vehicle, removed a bag from his jacket and handed it to the UC. The UC provided GIL CASTILLO with a package that appeared to contain currency and GIL CASTILLO walked away from the vehicle.

14. Officers with visible police badges and clothing then approached and attempted to arrest GIL CASTILLO. When he observed officers approaching him, GIL CASTILLO ran. Officers yelled "Police, Stop!" but GIL CASTILLO continued to run. Officers, never losing sight of GIL CASTILLO, engaged in a brief foot pursuit and apprehended him. While officers attempted to place him under arrest, GIL CASTILLO resisted and used the rear of his fist to strike a Trooper in the head. When he was arrested, GIL CASTILLO still had apparent currency given to him by the UC on his person. He also had a Dominican Republic identification card that allowed officers to confirm his identity.

15. The plastic bag that GIL CASTILLO gave to the UC contained multiple cylinders of a white or tan substance consistent with the quantity ordered by the CI. The UC determined, based on his training and experience, that the color, consistency, and packaging of the substance was consistent with heroin or fentanyl. As lab results for drugs that the CI sold in August (and which the CI stated came from the same source of supply as the substance distributed by GIL CASTILLO) confirmed that the substance contained fentanyl, I submit that there is probable cause to believe that the substance distributed by GIL CASTILLO contained a controlled substance.

16. As part of this investigation, law enforcement personnel have not conducted a presumptive field test of the substances encountered on September 8, 2017,

which, for the reasons indicated above, there is probable cause to believe are controlled substances, as defined by the Controlled Substances Act of 1970, as amended, 21 U.S.C. § 801 et seq. The decision to not conduct such a test was due to the significant threat to law enforcement personnel, first responders, and members of the public of exposure to fentanyl, fentanyl-related substances, synthetic opioids, and other powders which may be composed in full, or in part, of one of these substances. The most widely used methods of field testing by law enforcement agencies require that a small amount of the questioned substance be removed from its packaging or container so it can be introduced to a reagent or placed on a scanner. This process may result in some of the questioned substance being spilled or becoming airborne, which would subject those in the immediate vicinity to inadvertent physical contact with or inhalation of the questioned substance. The DEA has recently determined that the risks associated with possible accidental exposure that may occur during field testing are too great to justify such tests. Accordingly, the DEA has directed its personnel that only trained personnel, in a lab environment, with necessary personal protective equipment (PPE), should be conducting such tests, and they should be conducted in a controlled, safe environment. Conducting tests in an uncontrolled environment, and without proper PPE, poses an undue risk and could result in serious bodily injury or death to those unknowingly exposed to fentanyl, fentanyl-related substances, or synthetic opioids.

## CONCLUSION

17. Based on the above information, it is my conclusion that there is probable cause to believe, and I do believe, that beginning at an unknown date but at least by September 8, 2017, in the District of New Hampshire and elsewhere, GIL CASTILLO did conspire with others to distribute and possess with intent to distribute controlled substances in violation of Title 21, United States Code, section 841(a)(1) and section 846. I, therefore, respectfully request that this Honorable Court issue a warrant for the arrest of Juan Dimel Gil Castillo.

/s/ Juan D. Infante Jr.
JUAN D. INFANTE JR.
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

Sworn and subscribed before me this 13th day of October, 2017, in Concord, New Hampshire.

/s/ Andrea K. Johnstone
HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW HAMPSHIRE